IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DP WAGNER MANUFACTURING INC.        §
                                    §
            Plaintiff,              §
                                    §
v.                                  §        CIVIL ACTION NO. H-04-4610
                                    §
PRO PATCH SYSTEMS, INC. and         §
MARSHALLTOWN COMPANY a/k/a          §
MARSHALLTOWN TROWEL COMPANY,        §
                                    §
            Defendants.             §


MEMORANDUM AND ORDER


     Pending is Plaintiff DP Wagner Manufacturing Inc.'s Motion for

Partial Summary Judgment (Document No. 27).   After carefully

considering the motion, response, reply and the applicable law, the

Court concludes as follows:


I.  Background


     Plaintiff DP Wagner Manufacturing Inc. ("DP Wagner") asserts

against Defendant Pro Patch Systems, Inc. ("Pro Patch") claims of

false marking under the Patent Act, unfair competition, and

antitrust violations.   DP Wagner and Pro Patch have been competing

suppliers of metal wall patch products since the early 1990s.[1]

---

[1] The products at issue are metal patches for repairing holes
in drywall walls and other hollow interior surfaces.   According to
DP Wagner, "[t]he patches generally are composed of a layer of
metal for strength and a layer of fiberglass mesh to hold spackle
material around the metal.   Adhesive is applied to the back of the
patch, so that it can be stuck on a wall to cover a hole--leaving
the user's hands free to apply spackle.   Because of their strength

Around that time, Pro Patch began selling a wall patch product comprised of a perforated aluminum plate and a single layer of fiberglass mesh (the "Perforated Plate Patch").  Pro Patch later began offering a wall patch product comprised of a sheet of expandable aluminum mesh and a single layer of fiberglass mesh (the "Expandable Mesh Patch").[2]  In 1999, Pro Patch began packaging its products with a wax paper "release liner," which listed the numbers of the following four United States patents (collectively, the "relevant patents"):

- **U.S. Patent No. 4,135,017 (the "'017 patent").**  On January 12, 1977, Pro Patch's president Dennis Hoffman ("Mr. Hoffman") applied for a patent generally directed to the broad concept of a metal wall patch. Mr. Hoffman ultimately restricted his application to a laminate wall patch comprised of a "thin and relatively rigid non-combustible plate of aluminum sheeting" coated with adhesive material. This patent issued on January 16, 1979 and expired on December 12, 1997.  *See* Document No. 27 ex. C.

- **U.S. Patent No. 4,707391 (the "'391 patent").**  In 1987, Mr. Hoffman applied for and obtained a patent directed to a "vehicle body surface repair patch suitable for use in conjunction with a vehicle body surface repair compound" and comprised of "a thin, relatively rigid, flexible and deformable plate which is sufficiently bendable for matching the contours of the vehicle body surface to be repaired." Id. ex. D.

---

and ease of use, requiring no specialized tools or training, the use of metal, self-adhesive wall repair patches is the dominant method for repairing holes in drywall."  Document No. 27 at 2-3.

    [2] Pro Patch sells a third patch, comprised of an aluminum sheet with round holes and two sheets of mesh, that is not at issue in DP Wagner's motion for summary judgment.  Document No. 31 at 5.

- **U.S. Patent No. 5,298,099 (the "'099 patent").** In 1989, Mr. Hoffman applied for and obtained a patent directed to a "method of using a deformable and contourable metallic mesh together with a curable repair compound to repair a hole in a surface." Id. ex. F.

- **U.S. Patent No. 5,620,768 (the "'768 patent").** In 1993, Mr. Hoffman filed and obtained a patent directed to a three layer patch product consisting of an outer layer of fiberglass mesh, a middle reinforcing sheet, and an inner layer of fiberglass mesh coated with adhesive material. Id. ex. G.

Id. ex. L.  In addition, Pro Patch announced to its customers that it had "decided to mark all manufactured patches with [its] patent numbers" and asked its customers to "put the following language on your packaging: **U.S. Pat # 4,707,391, #5,620,768, #5,298,099 and foreign patents**." Id. ex. H (emphasis in original).

According to DP Wagner, "contrary to what Pro Patch led its customers, the public, and competitors and potential competitors to believe, the patents corresponding to the patent numbers that Pro Patch placed on [the release liner sold with] its products and instructed its customers to place on the[ir] packaging for such products, *did not* have any applicability to the products sold by Pro Patch." Document No. 27 at 10.  Pro Patch further contends that "[a]t the time of this improper marking Pro Patch not only *lacked a good faith basis* to believe that the marked patents applied to its products, *it knew* that the patents corresponding to the markings it was placing on its products did not have claims

covering such products." Id.  DP Wagner therefore moves for partial summary judgment in its favor on its false marking claim under the Patent Act, arguing that the evidence conclusively establishes that Pro Patch falsely marked its metal wall patch products with patent numbers that do not apply to those products in violation of 35 U.S.C. § 292.

## II.  Summary Judgment Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  Id.  "[T]he nonmoving party must set forth

4

specific  facts  showing  the  existence  of  a  'genuine'  issue
concerning every essential component of its case."  Id.

In  considering  a  motion  for  summary  judgment,  the  district
court must view the evidence "through the prism of the substantive
evidentiary burden."  Anderson v. Liberty Lobby, Inc., 106 S. Ct.
2505, 2513 (1986).  All justifiable inferences to be drawn from the
underlying facts must be viewed in the light most favorable to the
nonmoving  party.   Matsushita  Elec.  Indus.  Co.  v.  Zenith  Radio
Corp., 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in
this  light,  could  not  lead  a  rational  trier  of  fact  to  find"  for
the nonmovant, then summary judgment is proper.  Kelley v. Price-
Macemon,  Inc.,  992  F.2d  1408,  1413  (5th  Cir.  1993)  (citing
Matsushita,  106  S.  Ct.  at  1351).   On  the  other  hand,  if  "the
factfinder could reasonably find in [the nonmovant's] favor, then
summary  judgment  is  improper."   Id.   Even  if  the  standards  of  Rule
56 are met, a court has discretion to deny a motion for summary
judgment if it believes that "the better course would be to proceed
to  a  full  trial."   Anderson, 106 S. Ct. at 2513.


III.  Discussion


The Patent Act prohibits falsely marking unpatented items with
a patent number:

> Whoever marks upon, or affixes to, or uses in advertising
> in  connection  with  any  unpatented  article,  the  word
> 'patent'  and/or  any  word  or  number  importing  that  the

same is patented for the purposes of deceiving the public
. . . shall be fined not more than $500 for every such
offense.

35 U.S.C. § 292.  To prevail on a claim under this statute, the

plaintiff must establish that: (1) an article was marked with the

word "patent" or any word or number that imports that the article

is patented; (2) the article so marked was an "unpatented article";

and (3) the marking was "for the purposes of deceiving the public."

*See* id.; Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347,

1352 (Fed. Cir. 2005).

According to DP Wagner, the summary judgment evidence

establishes that, "since at least 1999,"

> (1) "Pro Patch has marked upon and affixed to all of its
> metal wall patch products both the word 'patent' and
> numbers importing the same to be patented";
>
> (2) Pro Patch's Perforated Plate and Expanded Mesh metal
> wall patch products are "unpatented articles" within the
> meaning of § 292 because
>
>> (a) neither product is a three-layered patch
>> covered by the '768 Patent,
>>
>> (b) neither product is a vehicle body surface
>> repair patch covered by the '391 Patent,
>>
>> (c) the Perforated Plate Patch is not an expandable
>> mesh plate covered by the '099 Patent, and
>>
>> (d) neither product is covered by the '017 Patent,
>> which had expired; and
>
> (3) "the clear and indisputable inapplicability of the
> patents at issue to the products marked by Pro Patch is
> such that there could be no reasonable belief that the

marked  patents  covered  the  marked  products,"  and  Mr.
Hoffman in fact held no such belief.

Document No. 27 at 11-15.  DP Wagner further contends that Mr.

Hoffman "admitted in his deposition that he was aware of the fact

that the patents that Pro Patch was applying to its Perforated

Plate and Expandable Mesh products could not and did not apply to

the products to which such patent markings were applied."  Id. at

15.    Thus,  DP  Wagner  argues,  the  summary  judgment  record

conclusively establishes that each of the statutory requirements

for imposing false marking liability on Pro Patch has been met.

In response, Pro Patch concedes that its products were marked

with the relevant patents but argues that it did not violate § 292

because (1) all of its products are covered by at least one of the

relevant patents and are therefore not "unpatented" articles, and

(2) Pro Patch lacked the requisite intent to deceive.

A.    The "Unpatented Article" Requirement

The  Federal  Circuit  recently  defined  the  term  "unpatented

article" as follows:

> When the statute refers to an "unpatented article" the
> statute means that the article in question is not covered
> by at least one claim of each patent with which the
> article is marked.

Clontech, 406 F.3d at 1352.  Because Pro Patch's products are not

covered by each of the patents with which they are marked, DP

7

Wagner argues, the products are "unpatented articles" within the meaning of § 292.

Pro Patch does not deny that its products are not covered by all of the patents with which they are marked.  Pro Patch does not dispute, for example, that the '017 patent is expired; that its Expanded Mesh Patch is not covered by the '768 patent; and that its Perforated Plate Patch is not covered by either the '099 patent or the '768 patent.[3]  Instead, Pro Patch disputes the meaning and

---

[3] Pro Patch does argue, however, that its products are properly marked with the '017 patent, asserting that "[i]t is not a violation of [§ 292] for a patent holder to continue to mark with an expired but previously applicable patent."  Document No. 31 at 18.  In support of this proposition, Pro Patch cites two cases, neither of which holds that marking a product with an expired patent can never constitute a violation of § 292.  *See* Arcadia Mach. & Tool Inc. v. Sturm, Ruger & Co., Inc., 786 F.2d 1124, 1125 (Fed. Cir. 1986) (upholding district court's grant of summary judgment in favor of patent holder who had marked his products with an expired patent, stating that "[p]aramount is the [district] court's finding and conclusion that Arcadia had totally failed, after at least nine months of discovery, to produce any evidence of intent to deceive the public."); FMC Corp. v. Control Solutions, Inc., 369 F. Supp. 2d 539, 584 (E.D. Pa. 2005) (holding that copyright infringement defendant failed to prove the affirmative defense of unclean hands, which was based on the patent holder's marking of its product with an expired patent, because there was no evidence that the patent holder had acted with the requisite intent to deceive).  It is self evident that once a patent has expired it provides no protection for the article that it described.  It necessarily follows that an article when marked with an expired patent number nonetheless remains an "unpatented article" within the meaning of § 292.  *See* Chisum on Patents, § 20.03[7][c][vii], at 20-657 ("There is little authority on whether continued use of a patent number on an article after expiration of the patent constitutes culpable mismarking.  The patent marking statute (35 U.S.C. Section 287) requires marking only with the patent number.  Because the issue date is not given, the expiration date cannot readily be determined.  Therefore, a strong case can be made for (continued...)

applicability of the Clontech decision, arguing that (1) "the main point for which Wagner cites Clontech (i.e. that an unpatented article is one that is not covered by all marked patents) was merely dicta and is directly at odds with the actual result in the case"; and (2) "even if Clontech did re-define what is meant by 'unpatented article' in [§] 292, the case represents a significant change in the law that is not applicable to the marking in this case."  Document No. 31 at 12.

First, Pro Patch argues that the definition of "unpatented article" set forth in Clontech is merely dicta, which the Clontech court itself did not actually follow.  Id. at 14-161.  In Clontech, the patent holder, Invitrogen Corporation ("Invitrogen"), marked certain of its molecular biology products--namely, its RNase H deficient Reverse Transcriptase ("RT") polypetides known as SUPERSCRIPT ("SS") and SUPERSCRIPT II ("SSII"); its kits for

---

<sup>3</sup>(...continued)
finding culpable mismarking when a person intentionally continues to mark articles with the number of an expired patent.").

Pro Patch also argues that all of its products are covered by the '391 patent.  *See* Document No. 31 at 16-17.  DP Wagner replies that "[g]iven the controlling nature of Clontech," which requires that the product in question be covered by *each* patent with which it is marked, "the Court need not address Pro Patch's tenuous argument that its vehicle body repair patent [i.e., the '391 patent] covered the wall patch products."  Document No. 33 at 4.  It appears that fact issues may exist on whether Pro Patch had a reasonable belief that its products fell within the scope of the '391 patent.  However, this will not preclude DP Wagner from obtaining a partial summary judgment that Pro Patch falsely marked certain of its products with the '017, '768, and '099 patents.

preparing DNA molecules using RTs; and its cDNA libraries--with one or more of four U.S. patents--the '797 patent, the '776 patent, the '005 patent, and the '608 patent (the "relevant patents"). Clontech, 406 F.3d at 1349-50.[4]   Clontech Laboratories, Inc. ("Clontech") sued Invitrogen, claiming that the kits, SS, SSII, and cDNA libraries were not covered by the relevant patents and were therefore falsely marked.

After a bench trial, the district court agreed.  Specifically, the district court determined that none of the relevant patents was directed to Invitrogen's cDNA libraries;[5] that the kits and SUPERSCRIPT products failed to meet the "substantially reduced RNase H activity" limitation, as defined in the relevant patents; that Invitrogen was on notice, by virtue of the results from experiments it conducted in 2000, that the kits, SS, and SSII did not meet the "substantially reduced RNase H activity" limitation and were therefore not covered by the relevant patents; and that

---

[4] According to the district court, each of the relevant patents was directed to "a gene which encodes reverse transcriptase having DNA polymerase activity and substantially no RNase H activity." See Clontech Labs., Inc. v. Invitrogen Corp., 263 F. Supp. 2d 780, 785 ¶¶ 17, 20-22 (D. Del. 2003).  According to the Federal Circuit, however, the '608 patent "contains a number of claims that define the amount of RNase H activity of the claimed RTs using language similar to, but different from, 'substantially no RNase activity,'" such as "substantially reduced RNase H activity," "no detectable RNase H activity," and "does not significantly degrade an mRNA template." See Clontech, 406 F.3d at 1355.

[5] This portion of the district court's decision was not challenged on appeal.

Invitrogen's failure to correct its mistaken mismarking of its products in light of the results of the 2000 experiments rose to the level of deceptive conduct. <u>Id.</u> at 1350-51. The trial court therefore held Invitrogen liable for falsely marking its products in violation of § 292.

On appeal, the Federal Circuit found that the district court misinterpreted the results of the 2000 experiments. <u>Id.</u> at 1353-55. According to the Federal Circuit, the evidence before the district court was that the 2000 tests, when properly interpreted, showed that in 13 of the 14 experiments performed, RNase activity was no different in the presence of SS or SSII than it was in the absence of RTs. <u>Id.</u> at 1354. The Federal Circuit therefore reversed the district court's "determination that the data generated by the 2000 experiments constituted notice to Invitrogen that the marking of SS and SSII was statutorily deceptive based exclusively on the limitation 'substantially no RNase H activity.'" <u>Id.</u> at 1355. In other words, the Federal Circuit held that Clontech did not prove by a preponderance of the evidence that Invitrogen had no reasonable belief that its products were properly marked with the patents containing the "substantially no RNase H activity" limitation. The Federal Circuit was careful to note, however, that it was "not reviewing and offer[ed] no opinion on whether Invitrogen's SS and SSII RTs me[t] the limitations of any of the claims in any of the patents." <u>Id.</u> at 1358.

11

With respect to the '608 patent, Invitrogen argued that "even if it knew that SS and SSII could not meet the 'substantially no RNase activity' limitation, it cannot be liable for false marking with the '608 patent because the claims of the '608 patent define the limiting levels of RNase H activity using different language." Id. at 1353.  Because the district court gave no indication that it interpreted this similar (but not identical) claim language, the Federal Circuit could not review whether the evidence supported a finding that Invitrogen had knowledge that SS and SSII failed to meet the claim limitations of the '608 patent.  Id. at 1355, 1358–59.  Accordingly, the Federal Circuit vacated the district court's determination that the SS and SSII were falsely marked with the '608 patent and remanded that issue to the district court.  Id.

According to Pro Patch, the Federal Circuit's decision to remand the false marking claim with respect to the '608 patent reveals that the Federal Circuit did not mean what it said when it stated that an "unpatented article" is a product not covered by at least one claim of *each* patent with which the article is marked. *See* Document No. 31 at 15.  Pro Patch contends that "[t]he 2000 test that Invitrogen ran did show that at least some of the patents (i.e. the ones calling for 'no activity') did not apply to the SS and SSII enzymes." Id.  Thus, Pro Patch argues, "since the set of Invitrogen patents marked on the enzymes and kits included some narrow (and thus inapplicable) patents [i.e., those with the

"substantially no RNase activity" limitation] the Federal Circuit
should have, assuming Wagner's view of the <u>Clontech</u> decision,
affirmed the district court's ruling under the 'new' definition of
'unpatented article.'"   <u>Id.</u>   Instead, Pro Patch argues, "because
*some* of the patent claims of one of the Invitrogen patents [<u>i.e.</u>,
the '608 patent] *might* have been broad enough to cover the enzymes
in question, the court remanded the case back to the district
court."   <u>Id.</u>   Thus, Pro Patch argues, the <u>Clontech</u> decision makes
clear that a product need only be covered by at least one of the
patents with which it is marked.

Pro Patch misconstrues the <u>Clontech</u> decision.   The Federal
Circuit did not, as Pro Patch contends, find that the 2000 tests
clearly established that SS and SSII were covered by the '797,
'776, and '005 patents; to the contrary, the Federal Circuit
specifically declined to decide whether SS and SSII were covered by
any of the patents.   What the Federal Circuit held is that even if
SS and SSII were not covered by the '797, '776, and '005 patents,
such that SS and SSII were mismarked, Clontech failed to prove by
a preponderance of the evidence that the mismarkings were made with
the requisite intent to deceive, given that the 2000 experiments
did not put Invitrogen on notice that SS and SSII failed to meet
the "substantially no RNase activity" limitation.   In other words,
because Clontech failed to prove the third element of a false
marking claim--that the marking was "for the purposes of deceiving

13

the public"--Clontech did not prove that SS and SSII were falsely marked with the '797, '776, and '005 patents.

Furthermore, the Federal Circuit's decision to remand the '608 patent claim does not, as Pro Patch contends, demonstrate that a product need only be covered by one of the patents with which it is marked.  As explained above, the Federal Circuit determined that Clontech failed to prove that SS and SSII were falsely marked with the '797, '776, and '005 patents.  Thus, if as Pro Patch contends, Invirtrogen need only have believed that SS and SSII fell within the scope of at least one of the relevant patents, then there would have been no reason for the Federal Circuit to remand the issue of whether Invitrogen had knowledge that SS and SSII did not meet the limitations of the '608 patent.  In other words, although the Federal Circuit had already determined that Clontech failed to prove that SS and SSII were falsely marked with the '797, '776, and '005 patents, the Federal Circuit nonetheless asked the district court to consider whether SS and SSII were falsely marked with the '608 patent.  Thus, contrary to Pro Patch's contention, the remand establishes that courts must consider whether a product is falsely marked with each patent.

According to Pro Patch, however, even if an "unpatented article" is an article not covered by each patent with which it is marked, this definition represents a significant change in the law that is not applicable to the markings in this case.  Pro Patch

14

contends that before May 5, 2005, the date of the <u>Clontech</u>
decision, "courts were generally in agreement that the term
'unpatented article' must be strictly construed as referring to a
product not covered by any claim of a patent included in the
marking." Document No. 31 at 13-14 (citing <u>Ansul Co. v. Uniroyal,
Inc.</u>, 306 F. Supp. 541, 565-66 (S.D.N.Y. 1969) ("It has been
stipulated by the parties that Uniroyal placed on labels of its MH
products the numbers of four patents, two of which, the 917 and
926, are inapplicable. . . . In fact, all of the Uniroyal MH
products . . . were covered with respect to their use by Claim 7 of
the 916 patent, one of the patents listed on the label. They were
not, therefore, 'unpatented products,' and the statute, by its
terms is not applicable.") (internal citations and footnotes
omitted), *reversed in part on other grounds*, 448 F.2d 872 (2d Cir.
1971), *cert. denied*, 92 S. Ct. 680 (1972); 7 Donald S. Chisum,
<u>Chisum on Patents</u>, § 20.03[7][c][vii], at 20-656 (2002) ("Section
292 requires as an element of patent mismarking that the marked
article be 'unpatented.' The courts apply this element literally.
Thus, they hold that, regardless of intent, there is no culpable
mismarking if the marker lists a number of patents and fewer than
all the patents cover the article.") (citing <u>Santa Anita Mfg. Corp.
v. Lugash</u>, 369 F.2d 964 (9th Cir. 1966); <u>Ansul</u>, 306 F. Supp. at

565-66).[6]   Because "[a]ll of the marking about which Wagner complains in this case occurred before the Federal Circuit's decision in Clontech," Pro Patch argues, Clontech's definition should not be applied in this case.   Document No. 31 at 12, 16.

Pro Patch's argument is not persuasive.   It is undisputed that the law as interpreted by the Federal Circuit governs this case.   See Holmes Group, Inc. v. Vornado Air Circulation Sys., 122 S. Ct. 1889, 1892-93 (2002); Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359 (Fed. Cir. 1999).   In Clontech, the Federal Circuit expressly stated that the term "unpatented article" "means that the article in question is not covered by at least one claim of each patent with which the article is marked," see Clontech, 406 F.3d at 1352 (emphasis added), and the Federal Circuit's construction is controlling in this case, notwithstanding the fact that other courts may have interpreted the term differently in the past.

_____

[6] Pro Patch also cites Noma Lites Canada, Ltd. v. Westinghouse Elec. Corp., 399 F. Supp. 243, 254 (D.D.C. 1975), as stating, "With this principle in mind, this court concludes--as at least one other court has done--that the statute only prohibits the marking of articles that are not subject to either foreign or domestic patent protection."   See Document No. 31 at 13.   Noma Lites contains no such statement.   The statement is made in Kor-CT, LLC v. Savvier, Inc., 344 F. Supp.2d 847, 857 (D. Conn. 2004), but at issue in that case was whether a product covered only by a foreign patent was an "unpatented article," in which case the patent holder's description of its product as "patented" was a mismarking.   Kor-CT is therefore inapposite to the issue before this Court--i.e., whether a product marked with multiple patent numbers, some of which are not applicable, is an "unpatented" article.

In sum, because it is undisputed that Pro Patch's products are not covered by at least one claim of *each* of the patents with which they are marked, the products are "unpatented articles" within the meaning of § 292.

B.   Intent to Deceive

Pro Patch also contends that its president, Mr. Hoffman, "did not intend to deceive anyone, and there is at least a question of fact regarding Mr. Hoffman's state of mind, and whether at the time he marked the products, he had an intent to deceive the public." Document No. 31 at 12.   In Clontech, the Federal Circuit explained the intent to deceive requirement as follows:

> Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true. Seven Cases v. United States, 239 U.S. 510, 517-18, 36 S. Ct. at 779, 795-96 (1970).   Intent to deceive, while subjective in nature, is established in law by objective criteria. Id.   Thus, "objective standards" control and "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent." See Norton v. Curtiss, 57 C.C.P.A. 1384, 433 F.2d 779, 795-96 (1970).   Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability.   Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood.   But in order to establish knowledge of falsity the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (i.e., covered by a

patent).  Absent such proof of lack of reasonable belief,
no liability under the statute ensues.

Clontech, 406 F.3d at 1352-53; *see also* Brose v. Sears, Roebuck &
Co., 455 F.2d 763, 769 n.8 ("The statute does not extend to one who
has an honest, though mistaken, belief that upon a proper
construction of the patent it covers the article in question.").
In other words, the intent to deceive requirement is satisfied with
evidence that the patent holder marked a product with a patent
without a good faith belief that the patent included a claim that
covered the product.

DP Wagner argues that the summary judgment evidence
conclusively establishes that Pro Patch mismarked its products with
the requisite intent to deceive because the "*undisputed record*
shows that Pro Patch engaged in the marking of its products with
*full knowledge* that the patent numbers were being applied to its
products where the patents at issue did not include any claims that
covered the marked products."  Document No. 33 at 5.  DP Wagner
points out that Mr. Hoffman admitted in his deposition that the
'768 patent, which covers a three-layer patch with two mesh layers,
does not apply to Pro Patch's two-layer Perforated Plate Patch or
Expandable Mesh Patch products; that the '099 patent, which covers
a patch made of expandable metallic mesh, does not apply to Pro
Patch's Perforated Plate Patch products, which consist of a
perforated aluminum plate and a single layer of fiberglass mesh;

18

and that he knew that the release liner listing all four of the relevant patents was going to be used on everything Pro Patch manufactured. *See* Document No. 27 ex. E at 75, 78-79, 102-03, 109-10. DP Wagner also notes that Mr. Hoffman does not contend that he had a good faith belief that Pro Patch's two-layer products were covered by the three-layer '768 patent with which they were marked; that its perforated plate products were covered by the expandable mesh '099 patent with which they were marked; or that the '017 patent had not yet expired.     Thus, DP Wagner argues, the uncontroverted summary judgment evidence establishes "the fact of misrepresentation [*i.e.*, that the Expandable Mesh Patch products are covered by the '017 and '768 patents, and that the Perforated Plate Patch products are covered by the '017, '768, and '099 patents] coupled with proof that the party making it [Mr. Hoffman] had knowledge of its falsity."   *See* Document No. 27 at 5-7.

In response, Mr. Hoffman declares that he "made the decision to apply [the relevant patents] to the release liner" in an effort to "differentiate [his] product from potential copiers"; that his "only objective in marking [his] products was to provide a unique identification that would not upset his private label customers by revealing the manufacturer of the product and would allow [him] to tell [his] products from other suppliers[']"; that he "did not intend to deceive the public in marking [his] release liner"; that, "based on communication with [his] patent counsel, he "understood

19

that if [he] had made or was planning to offer products that [he] felt were the subject of [his] patents, [he] should include those numbers"; that "[s]ince the release liner was used with all of [his] products, [he] included four of [his] patents, i.e., [the relevant patents]" on it; and that "[i]t would be a significant logistical problem and impossible from a practical standpoint to have different release liners for different patches." *See* Document No. 31 ex. 1 ¶¶ 18-21, 24-30.   In other words, Mr. Hoffman essentially avers that he did not act with the requisite intent because his primary purpose in marking the products with the relevant patent numbers was to "differentiate [Pro Patch's] various products from knock-offs without putting his company's name on the private labeled products," not to deceive the public.   Document No. 31 at 11.   Mere denial of intent, however, does not legally suffice to create a fact issue regarding good faith.   *See* Clontech, 406 F.3d at 1352-53 ("[T]he mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability.   Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood.").

Likewise, to the extent Mr. Hoffman alleges that he had a good faith belief that it was not a violation of the law, as he understood it, to place on his products patent numbers that he knew to be inapplicable to those products, this contention fails to give rise to a genuine issue of material fact on the question of Pro

Patch's intent.  Id. at 1353 n.2 ("Invitrogen has a third argument, which it contends is a blanket defense to all charges of false marking.  The argument is based on the district court's findings that employees 'unfamiliar with the patent laws' honestly believed the products to be correctly marked.  This of course is preposterous. . . . [T]he inference of intent to deceive cannot be defeated with blind assertions of good faith where the patentee has knowledge of mismarking.").  Thus, the uncontroverted summary judgment evidence conclusively establishes "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity," and Pro Patch has failed to present any evidence that would defeat the resulting inference of fraudulent intent.  DP Wagner is therefore entitled to summary judgment on its false marking claim.

In sum, DP Wagner has established that Pro Patch falsely marked its Perforated Plate Patch products with the '017, '768, and '099 patents, and falsely marked its Expandable Mesh Patch products with the '017 and '768 patents, in violation of § 292.  Summary judgment must therefore be granted in favor of DP Wagner on its false marking claim with respect to those patents.  DP Wagner has not, however, established as a matter of law that Pro Patch falsely marked its products with the '391 claim, and DP Wagner's motion for summary judgment will be denied with respect to that patent.

IV.   <u>Order</u>

Based on the foregoing, it is

ORDERED that Plaintiff DP Wagner Manufacturing Inc.'s Motion for Partial Summary Judgment (Document No. 27) is GRANTED IN PART, and Defendant Pro Patch Systems, Inc. is adjudged to have violated 35 U.S.C. § 292 by falsely marking its Perforated Plate Patch products with the '017, '768, and '099 patents and by falsely marking its Expandable Mesh Patch products with the '017 and '768 patents.   The motion is otherwise DENIED.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 21st day of April, 2006.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

22