IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DP WAGNER MANUFACTURING, INC., §
§
       Plaintiff, §
§
v. §    CIVIL ACTION NO. H-04-4610
§
PRO PATCH SYSTEMS, INC., §
§
   Defendant. §

MEMORANDUM AND ORDER

On June 8, 2006, the Court conducted a claim construction hearing concerning U.S. Patent No. 4,707,391 (the "'391 patent"), entitled "Vehicle Body Surface Repair Patch Assembly." After carefully considering the '391 patent, the submissions of the parties, and the arguments of counsel, the Court construes the sole independent claim of the '391 patent as follows:

I. Background

The background for this suit and identities of the parties may be found in the Court's Memorandum and Order entered April 21, 2006. Among other things, Plaintiff DP Wagner Manufacturing, Inc. ("DP Wagner") accuses Defendant Pro Patch Systems, Inc. ("Pro Patch") of falsely marking its metal wall repair patch products with the '391 patent in violation of 35 U.S.C. § 292(a). At the heart of the parties' dispute concerning the proper construction of the '391 patent is the effect of the phrase "vehicle body surface

repair patch" used in the preamble of Claim 1 of the '391 patent. Pro Patch asserts that this language merely discloses an intended use or purpose for the claimed apparatus. DP Wagner contends that by entitling the patent "vehicle body surface repair patch" and using that term and phrases "the vehicle body surface to be repaired," and "a vehicle body surface repair compound" throughout the patent's specification and in the preamble, and by using the latter two phrases in the body of Claim 1, Pro Patch has expressly limited the scope of the '391 patent to the repair patches described therein only if they are packaged, marketed, and/or sold for use as *automobile* or *vehicle* repair patches.

<u>Claim 1 of the '391 Patent and the</u>
<u>Relevant Prosecution History</u>

Claim 1, the only independent claim of the '391 patent, provides as follows:

> An improved vehicle body surface repair patch assembly suitable for use in conjunction with a vehicle body surface repair compound, said vehicle repair patch assembly comprising:
>
> a thin, relatively rigid, flexible and deformable plate which is sufficiently bendable for matching the contours of the vehicle body surface to be repaired, said plate containing a plurality of perforations therein for receiving, supporting and holding a vehicle surface body repair compound and having a first side with a central surface thereon for covering the vehicle body surface to be repaired, a periphery for disposition into intimate proximity with the vehicle body surface, and

> bordered by edge portions, said plate having a second side opposing the first side;
>
> adhesive coating means disposed on the first side of said plate and on at least a substantial portion of the periphery thereof for firmly bonding the periphery in intimate proximity to the vehicle body surface to be repaired; and
>
> mesh means secured at the interior surface thereof to the second side of said plate for receiving, supporting and holding a vehicle body surface repair compound therein to dispose said mesh means in substantially matching contoured relationship to the vehicle body surface to be repaired.

Document No. 72 ex. A. The United States Patent and Trademark Office ("USPTO") initially rejected Claim 1 as being obvious in view of a patent obtained by Carol J. Jones, entitled "Method of Patching Car Bodies" (the "Jones patent") and a patent obtained by Michel Kotcharian, entitled "Laminated Composite Material Usable in Heat-Insulating Composite Walls" (the "Kotcharian patent"). *See* Document No. 73 ex. B at 31-32; ex. C; ex. D. The patent examiner found that "Jones . . . discloses a patch similar to that claimed" and that "Kotcharian shows . . . a metal layer or film of elastomeric material secured to a web of glass fibers," and stated that "[t]aken together the references would fairly suggest to those of ordinary skill in the art and presumed to be familiar with them what the applicant has done." Id. ex. B at 32.

In response to the examiner's rejection, the patent applicant, Dennis Hoffman ("Hoffman" or the "applicant"), did not amend Claim 1. Instead, Hoffman presented detailed and particularized

3

reasons why Claim 1 was patentable over the Jones and Kotcharian patents, as follows:

> Manifestly, the Jones reference, the primary cited reference, does not teach any penetration of the body compound through any apertures in the patch, as disclosed and claimed in Claim 1 of the applicant's present application.  In addition, Jones requires the use of a foam separation means between the metal sheet and the body to be repaired.  Furthermore, Jones, requires the use of some tool to adhere the patch to the vehicle body.  Indeed, such foam material is one-thirty second (1/32) of an inch thick, which is substantially thick, and accordingly will leave a substantial "bump" on the body surface to be repaired.  Yet additionally, and considering that no apertures in the metallic sheet of the Jones apparatus are taught, the finished Jones patch must have the body compound entirely disposed on the outer surface thereof, which further adds to the "bumpiness" problem, and renders the patch must [sic] less stable than in the patch of the present invention, wherein there is a penetration of the body compound to provide a substantially thick patch which would be substantially congruent with the automobile surface to be repaired.
>
> The Kotcharian patent is even further far afield.  That patent uses a gauge of aluminum which is in the aluminum foil range, rather than a sheet which is "relatively rigid" as required by Claim 1 of the presently pending claims.  In fact, the Kotcharian patch is not designed to be placed over an aperture and would indeed sink into an aperture.  But rather the Kotcharian patch is designed to cover seams only. Yet additionally, the Kotcharian patch has an aluminum foil structure which cannot have apertures disposed therein or the heat insulating purpose of the Kotcharian patch would be entirely destroyed.  Yet additionally, and also as the Kotcharian patch specifically teaches, the aluminum layer may not be thicker than the foil thickness of "higher than about 0.1 mm", as the same "would lead to stresses, resulting from the thermal contraction, which would cause the breakage of the heat-insulating wall in the dihedral angles of thereof.  Moreover, such a thickness would render the composite material more rigid and less easy to handle or use." (Col. 5, lines 52-53).  Wherefore, the

Kotcharian patent is the exact opposite of what is required by Claim 1 of the presently pending application.

In summary, neither of the Jones or Kotcharian patents can accomplish the functioning of the present invention. Yet further, neither of the Jones or Kotcharian patents provides structures which meets the presently pending claims. Moreover, both of Jones and Kotcharian teach away from the presently pending claims.

Yet additionally, there is no teaching or suggestion in either of the Jones or Kotcharian patents that the structure should be combined (i.e., that there would be a benefit or desirable feature gained by such proposed combination). That is premised upon the fact that Jones is related to an auto body patch having a structure for carrying out certain purposes, and the Kotcharian structure is directed to a cryogenic tank having a structure for accomplishing entirely different purposes (i.e., heat insulation as opposed to physical beauty of an automobile body).

In further addition, it should be apparent that those seeking solutions to automobile repair problems do not go to the cryogenic tank arts for solutions. This fact is re-enforced by the fact that nothing in the Kotcharian patent teaches or suggests that it would ever be useful as an automobile repair patch. Hence, it becomes further clear that the Kotcharian patch is neither:

- a). In the field of the applicant's endeavor (i.e., the automobile repair arts); nor

- b). In a field reasonably related to the problems faced and solved by the applicant's invention (See In re Woods, et al., 202 USPQ 171, 174 (C.C.P.A. 1979); In re Pagliaro et al., 210 USPQ 888, 892 (C.C.P.A. 1981)).

Accordingly, it is further respectfully submitted that the Kotcharian patent is not properly to be found within the relevant "scope and content of the prior art" as that term is used in Graham v. Deere, 383 U.S. 1, 17 (1966).

Id. ex. B at 47-50. The USPTO responded by issuing a Notice of Allowability of Claims 1-16, and the '391 patent issued thereafter.

### The Present Dispute

The parties' sole dispute concerning claim construction revolves around the effect of the language in the '391 patent describing the claimed apparatus as a "vehicle body surface repair patch." DP Wagner contends that this language limits the scope of the patent to repair patches packaged, marketed, and/or sold for use in repairing automobiles because (1) the phrases "vehicle body surface repair patch," "vehicle body surface to be repaired," and "vehicle body surface repair compound" appear throughout the '391 patent; (2) references to "vehicle body surface" appear in both the preamble and the body of Claim 1; and (3) Hoffman argued, in response to the patent examiner's initial rejection of Claim 1, that Hoffman's patch was patentable over the Kotcharian patent because the claimed patch was limited to the field of automobile repair while the Kotcharian patent was directed to a patch for use in an unrelated field, i.e., the cryogenic tank repair arts.[1]

---

[1] DP Wagner also relies on extrinsic evidence, such as (1) Hoffman's deposition testimony that he was "trying to get a patent for automobiles" and that the '391 patent was a "car patch" patent, and (2) Hoffman's arguments, in prosecuting a prior patent directed to a wall patch, that references disclosing autobody and roofing patches were not prior art because they were "from a diverse art," and not the art of wall repair. See Document No. 72 at 13-15. On the other hand, Pro Patch relies on Paul Wagner's deposition testimony that DP Wagner did not consider making a metal

Pro Patch concedes that the '391 patent is undeniably directed at a patch for use in the repair of automobiles. Nonetheless, Pro Patch argues, the phrase "vehicle body surface repair patch" in the preamble of Claim 1 of the '391 patent is a statement of intended use, not a positively recited element of the claim, and it is therefore improper to incorporate such language as an affirmative limitation on the patch claimed as the invention. In other words, it is Pro Patch's position that a repair patch that meets the structural limitations set forth in the body of Claim 1 reads on Claim 1, regardless of whether the repair patch is packaged, marketed, sold, or used for the repair of a vehicle body surface or some other surface, such as drywall. With respect to the prosecution history of the '391 patent, Pro Patch asserts that although Hoffman did distinguish the field of cryogenic tank repairs from the field of automobile repairs, the main point of Hoffman's arguments in response to the patent examiner's rejection of Claim 1 was that the apparatus described in Claim 1 was *structurally* distinguishable from the apparatus taught in the Kotcharian patent. Thus, Pro Patch argues, neither the '391 patent itself nor its prosecution history provides any basis for limiting

---

patch product with holes because it believed such a product to be patented to Pro Patch. *See* Document No. 73 at 2-3. Because the legally operative meaning of Claim 1 is apparent from the '391 patent itself and the prosecution history without reference to extrinsic evidence, the Court declines to rely on the parties' extrinsic evidence. *See* Phillips v. AWH Corp., 415 F.3d 1303, 1317-19 (Fed. Cir. 2005) (en banc).

the '391 patent to patches that are packaged, marketed, and/or sold for use only as automobile repair patches.

## II.   The Applicable Legal Principles

The Patent Act prohibits falsely marking unpatented items with a patent number:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' and/or any word or number importing that the same is patented for the purposes of deceiving the public . . . shall be fined not more than $500 for every such offense.

35 U.S.C. § 292.  "When the statute refers to an 'unpatented article' the statute means that the article in question is not covered by at least one claim of each patent with which the article is marked."  Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005).  "Thus, in order to determine if an article is 'unpatented' for purposes of section 292, it must be first determined whether the claims of a patent cover the article in question."  Id.  "To make that determination, the claim in question must be interpreted to ascertain its correct scope, and then it must be ascertained if the claim reads on the article in question."  Id.

Claim construction is strictly a legal question for the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 116 S. Ct. 1384 (1996).  "It is a bedrock principle

of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips, 415 F.3d at 1312 (internal quotation marks and citations omitted). Thus, "a claim construction analysis must begin and remain centered on the claim language itself." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing Markman, 52 F.3d at 979). "Such intrinsic evidence is the most significant source of the legally operative meaning of the disputed claim language." Vitronics, 90 F.3d at 1582.

"The determination of whether preamble recitations are structural limitations or mere statements of purpose or use 'can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997) (quoting Corning Glass Works v. Sumitomo Elc. USA, Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)); *accord* Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002). *See also* Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1572-73 (Fed. Cir. 1996)

("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history."). "The inquiry involves examination of the entire patent record to determine what invention the patentee intended to define and protect." Rowe, 112 F.3d at 478 (citations omitted).

"In general, a preamble limits the invention if it recites essential structure[s] or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." Catalina, 289 F.3d at 808 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" Catalina, 289 F.3d at 808 (quoting Rowe, 112 F.3d at 478)).

Although "[n]o litmus test defines when a preamble limits claim scope," "guideposts . . . have emerged from various cases discussing the preamble's effect on claim scope":

- "Jepson claiming generally indicates intent to use the preamble to define the claimed invention, thereby limiting claim scope";

- "[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the

> preamble and claim body to define the claimed invention";

- "[W]hen the preamble is essential to understand limitations or terms in the claim body, the preamble limits the claim scope";

- "[W]hen reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation";

- "[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention. Without such reliance, however, a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention."

Catalina, 289 F.3d at 808-09 (citations omitted).

"[P]reambles describing the use of an invention generally do not limit the claims because the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure." Id. at 809 (citation omitted). "Indeed, 'the inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not.'" Id. (quoting Roberts v. Ryer, 91 U.S. 150, 157 (1875)). "More specifically, this means that a patent grants the right to exclude others from making, using, selling, offering to sale, or importing the claimed apparatus or composition, whether or not the patentee envisioned

such use." Catalina, 289 F.3d at 809 (citing 35 U.S.C. § 271). "Again, such statements of intended use or asserted benefits in the preamble may, in rare instances, limit apparatus claims, but only if the applicant clearly and unmistakably relied on those uses or benefits to distinguish prior art." Catalina, 289 F.3d at 809.

### III. Discussion

Although DP Wagner points out that the phrases "vehicle body surface to be repaired" and "vehicle body surface repair compound" appear in the body of Claim 1, the parties seem to have no disagreement about the terms used or the structural limitations set forth in the body of Claim 1.[1] Hence, the real question in controversy is whether the preamble creates an affirmative

---

[1] Both parties appear to agree that Claim 1 discloses a repair patch consisting of a thin, relatively rigid, flexible, and deformable plate, which (1) is sufficiently bendable for matching the contours of a vehicle body; (2) is perforated for receiving, supporting, and holding a vehicle surface body repair compound, such as Bondo™; (c) has, on one side, a central surface for covering the vehicle surface to be repaired, a periphery for disposition into intimate proximity with the vehicle surface to be repaired, and an adhesive coating means that covers both the central surface and the periphery; and (d) has, secured to the second side, a mesh means for receiving, supporting, and holding a vehicle surface body repair compound, such as Bondo™. ProPatch's manufactured patch that reads on the '391 Patent was displayed to the Court during oral argument, and DP Wagner conceded it had no opposition to ProPatch marketing that patch as a vehicle body repair patch. Its only objection is that it could not be marketed for other use. The sole issue presented to the Court is whether a repair patch that meets these structural limitations must also be packaged, marketed, sold, and/or used as an *automobile or vehicle body* repair patch in order to read on the '391 patent.

12

limitation on the claim.  Viewing the '391 patent as a whole, the inventor clearly intended the claimed repair patch to be used for the purpose stated in the preamble: as a vehicle body surface repair patch.  As already observed, the patent itself is entitled "Vehicle Body Surface Repair Patch Assembly," and the specification repeatedly refers to the invention as a "vehicle body surface repair patch."  *See* Document No. 73 ex. A.  Likewise, the Background of the Invention plainly states that the invention was "directed in general to the vehicle body repair arts, and more particularly to an improved vehicle body surface repair patch assembly providing considerable thickness to the repair patch and ease of pending such patch to match the contours of the surface to be repaired," and that the inventor designed the repair patch "in view of the defects and deficiencies of prior art vehicle body repair patch apparatus" and "to materially alleviate such deficiencies and difficulties."  Id.  Given the '391 patent's focus on and repeated references to a "vehicle body surface repair patch," DP Wagner's contention that the '391 patent covers only repair patches for use in repairing vehicles is facially appealing.

The Court must examine, however, whether the phrase "vehicle body surface repair patch" in the preamble to Claim 1 actually operates to limit the scope of the '391 patent to patches that are packaged, marketed, and/or sold *only* for use in the repair of *vehicle body* surfaces.  Although the preamble unquestionably

13

describes the intended use of the claimed patch--repairing vehicle body surfaces--it recites no element of the structure or structurally significant information, that is essential to understand the structural limitations set forth in the body of Claim 1. Stated differently, the *use* made of the patch in repairing a vehicle body surface is not essential to the patch's structure, and the deletion of the phrase "vehicle body surface" from the preamble would not affect the structural features of the patch.

DP Wagner contends that the phrase "vehicle body surface repair patch" should be construed as a limitation on Claim 1 because in prosecuting the '391 patent, Hoffman relied on the purpose or intended use of the repair patch--the repair of an automobile--to distinguish it from the prior art. "In effect, [DP Wagner] argues that [Hoffman] attempted to establish the patentability of [his] claimed apparatus over a prior art reference (the [Kotcharian] patent) by pointing out that [his] apparatus had a different intended use." Watson & Chalin Mfg., Inc. v. Boler Co., 227 F. Supp. 2d 633, 638 (E.D. Tex. 2002). "Contrary to [DP Wagner]'s assertion, however, 'the grant of a patent on a composition or a machine cannot be predicated on a new use of that machine or composition.'" Id. (quoting In re Hack, 245 F.2d 246, 248 (C.C.P.A. 1957); *see also* In re Schreiber, 128 F.3d 1473, 1477 (Fed. Cir. 1997) ("It is well settled that the recitation of a new

intended use for an old product does not make a claim to that old product patentable."). Thus, Hoffman's arguments could not have established the patentability of the patch described in Claim 1 if their sole basis was that Hoffman had discovered that the Kotcharian patch could also be used on automobiles.

In responding to the patent examiner's rejection for obviousness, Hoffman in fact did not merely consign the Kotcharian patch to use in repairing cryogenic tanks and his own patch to use in repairing automobiles. Instead, Hoffman first and specifically distinguished the structural features of his patch--namely, the "relatively rigid" plate "containing a plurality of perforations therein"--in explaining how it differed from the Kotcharian patch. Hoffman pointed out that the Kotcharian patch "uses a gauge of aluminum which is in the aluminum foil range, rather than a sheet which is 'relatively rigid' as required by Claim 1 of the presently pending claims," and that "the Kotcharian patch has an aluminum foil structure which cannot have apertures disposed therein or the heat insulating purpose of the Kotcharian patch would be entirely destroyed." Document No. 73 ex. B at 48. It was only after detailing at some length the structural differences in his invention that distinguished it from the Kotcharian patch did Hoffman bolster his argument by mentioning the different objectives in the repair of a cryogenic tank and an automobile. When viewed objectively and in context, Hoffman cannot be said to have relied

"specifically on the preamble, rather than on the structural limitations set forth in the body of the claim," and the preamble is not transformed into a claim limitation. Intertool, Ltd. v. Texor Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004); *see also* Catalina, 289 F.3d at 809 ("[S]uch statements [i.e., describing the use of an invention] in the preamble may, in rare instances, limit apparatus claims, but only if the applicant clearly and unmistakably relied on those uses or benefits to distinguish prior art.")

Accordingly, the Court concludes that the multiple references to a "vehicle body surface repair patch" in the '391 patent do not limit Claim 1 to repair patches that meet the structural limitations set forth in Claim 1 only if those repair patches are packaged, marketed, and/or sold for use in repairing automobiles. The body of Claim 1 defines a structurally complete patch, one useful as the inventor envisioned to repair a vehicle body surface, but one that may just as well be applied to some other use that the inventor may or may not have envisioned, such as repairing another type of surface such as a door or a wall. DP Wagner, at the end of the day, effectively adopted the position in oral argument that a competitor of ProPatch, if it manufactured the exact repair patch that meets all of the structural limitations and fully reads on the '391 Patent, could with impunity package, market, and sell those patches as wall repair patches without infringing ProPatch's '391

16

Patent. This would turn patent law on its head. "[P]reambles describing the use of an invention generally do not limit the claims because the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure," and "the inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not." Catalina, 289 F.3d at 809 (citations omitted); *see also* Catalina, 289 F.3d at 808 ("[A] preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'") (quoting Rowe, 112 F.3d at 478); Pitney Bowes, 182 F.3d at 1305 ("If . . . the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation) (citations omitted).

IV. Order

Based on the foregoing, it is hereby

17

ORDERED that Claim 1 of the '391 patent is not limited to repair patches that meet the structural limitations set forth in Claim 1 only if those repair patches are packaged, marketed, sold, and/or used as automobile or vehicle body repair patches; rather, any repair patch that meets the structural limitations set forth in the body of Claim 1 reads on Claim 1, regardless of whether the repair patch is packaged, sold, marketed, and/or used for the repair of a vehicle body surface or some other surface, such as a wall.

The Clerk will enter this Order and send copies to all counsel of record.

SIGNED at Houston, Texas on this 19th day of June, 2006.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE